1  Anthony D. Prince (SBN # 202892)
   General Counsel, California Homeless Union/Statewide Organizing Council
2  Law Offices of Anthony D. Prince
   2425 Prince Street, Ste. 100
3  Berkeley, CA 94705
   Tel: 510-301-1472
4
5  Attorneys for Plaintiffs

Pag
- 1 -

### UNITED STATES COURT

6
### NORTHERN DISTRICT OF CALIFORNIA

7

8  SANTA CRUZ HOMELESS UNION, on        ) **Case No.:**
   behalf of itself and those it represents; SANTA )
9  CRUZ FOOD NOT BOMBS; ALICIA         ) ***Ex Parte* APPLICATION FOR**
   AVALOS, HANNAH HEGEL, CHRIS         ) **EMERGENCY TEMPORARY**
10 INGERSOLL and RANDOLPH TOLLEY, on   ) **RESTRAINING ORDER and**
   behalf of themselves and similarly situated ) **PRELIMINARY INJUNCTION TO HALT**
11 homeless persons,                    ) **CLOSING OF SAN LORENZO PARK**
                                        ) **AND THE BENCHLANDS HOMELESS**
12          Plaintiffs                   ) **ENCAMPMENTS and ORDERING**
                                        ) **COMPLIANCE WITH STATE AND**
13     vs.                              ) **COUNTY COVID-19 PUBLIC HEALTH**
                                        ) **ORDERS; COMPLAINT FOR**
14                                      ) **INJUNCTIVE RELIEF UNDER the**
   CITY OF SANTA CRUZ, MARTIN          ) **FOURTEENTH AMENDMENTS TO THE**
15 BERNAL, individually and in his official ) **U.S. CONSTITUTION, 42 U.S.C. § 1983**
   capacity as City Manager for the City of Santa ) **AND CALIFORNIA CONSTITUTION**
16 Cruz; TONY ELLIOT, individually and in his ) **ART.1, § 7;**
   capacity as Director of Director of Parks &  ) **DECLARATION OF ANTHONY D.**
17 Recreation for the City of Santa Cruz;   ) **PRINCE;**
   ANDREW MILLS, individually and in his ) **[Proposed] ORDER**
18 capacity as Chief of Police for the City of )
   Santa Cruz,                          )
19                                      )
                                        )
20          Defendants                   )
                                        )
21

22              **INTRODUCTION AND BACKGROUND**

23      1.      Individual homeless plaintiffs **ALICIA AVALOS, HANNAH HEGEL, CHRIS**

24 **INGERSOLL** and **RANDOLPH TOLLEY** and organizational plaintiffs **SANTA CRUZ**

25 **HOMELESS UNION** and **SANTA CRUZ FOOD NOT BOMBS**, ("Plaintiffs") bring this

26
   Emergency Action for a Temporary Restraining Order and Preliminary Injunction against **City Of**
27
28 **Santa Cruz**, and in both their individual and official capacities, respectively, Santa Cruz City

*Ex Parte* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND COMPLAINT

Manager **Martin Bernal**, Director of Parks & Recreation Tony Elliot and Chief of Police **Andrew Mills** (collectively, "Defendants") to enjoin Defendants' unlawful closure of San Lorenzo Park and "the Benchlands" where close to 200 homeless persons have been encamped, fed and provided with life-saving survival items for over six months and now face separation from such vital services and eviction into the streets and wooded parts of Santa Cruz County as COVID-19 infections and deaths reach record levels.

2.      On December 3, 2020, the California Department of Public Health issued a "Regional Stay at Home Order" signed by Erica S. Pan, MD, MPH, Acting State Public Health Officer, which called attention to the dramatic worsening and unprecedented increase in the rate of increase in COVID-19 infections and fatalities. The Order commanded, among other things, that when Intensive Care Unit capacity falls below 15%, "all individuals living in the Region shall stay at home ***or at their place of residence*** except as necessary to conduct activities associated with the operation, maintenance or usage of critical infrastructure […]. (Exhibit A)(Emphasis added.) The order did not provide an exception for homeless persons.

3.      On December 16, 2020, the Health Services Agency of the County of Santa Cruz issued a Press Release announcing that based on data released by the State of California showing ICU bed availability had fallen below the 15% threshold, "the Regional Stay-at-Home Order" would commence the next day, December 17, 2020. (Exhibit B) The Press Release quoted Santa Cruz County Health Officer Dr. Gail Newel: "We urge all residents to ***adhere to state guidelines*** as closely as possible to ***minimize the spread of COVID-19*** and help ***reduce impacts to our most vulnerable residents.*** " The Health Services Agency statement did not provide an exception for homeless persons; on the contrary, as quoted above, the County Health Officer made a public call to "reduce impacts to our most vulnerable residents."

4.      The very next day, December 17, 2020, Defendants Santa Cruz City Manager Martin Bernal and Parks & Recreation Director Tony Elliot, issued a "Memorandum and Order" (Exhibit

*Ex Parte* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND COMPLAINT

1  C) announcing their intention to close San Lorenzo Park as well as an area known as "the

2  Benchlands" which is adjacent to San Lorenzo Park. Plaintiffs vigorously dispute Defendants'

3  inaccurate and pretextual description of the conditions at these areas as alleged in the Memorandum

4  and Order as the City's justification for removing homeless persons and closing the park.

5      5.      The next day, Dr. Gail Newel, the Santa Cruz County Health Officer, publicly

6  replied to an inquiry posted on Facebook from community activist Abbi Dale. (Exhibit D) Dale

7  wrote and asked Dr. Newel to "let [her] know why the City is evicting people at the [San Lorenzo

8  Park] encampment against CDC Guidelines?"  County Health Officer Newel immediately replied to

9  Abbi Dale writing, "I agree with you and share your concerns. This was a decision of the City of

10  Santa Cruz, independent of the County, for which I work. ***Public Health was not consulted about***

11  ***this. If we had been, we would have advised against this for the very reasons you cite.***" (Emphasis

12  added.)

13

14      6.      On December 18, 2020, Plaintiff Santa Cruz Homeless Union President Alicia Kuhl

15  sent a "Cease and Desist" Letter to City Manager Martin Bernal, Parks & Recreation Director Tony

16  Elliot, City Attorney Tony Condotti  and all members of the Santa Cruz City Council in which she

17  requested that "[The City of Santa Cruz] CEASE AND DESIST from the closure of San Lorenzo

18  Park and the Benchlands which included a verbatim recitation of the CDC guidelines prohibiting

19  the clearing of homeless encampments where individual housing options are not available. (Exhibit

20  E). Homeless Union President Kuhl did not receive a single reply.

21

22      7.      On the morning of December 29, 2020, Counsel for Plaintiffs sent a meet and confer

23  email to City Attorney Tony Condotti requesting that the City of Santa Cruz suspend further

24  clearing of San Lorenzo Park and the Benchlands and urging that all impacted parties discuss

25  resolution of the situation. City Attorney Condotti was further advised that if the City did not halt

26  the clearing of the encampments, Plaintiffs would immediately avail themselves of all available

27

28

*Ex Parte* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND COMPLAINT

legal remedies. Mr. Condotti did not reply to Counsel for Plaintiffs communication. (See, Exhibit A to Declaration of Anthony D. Prince)

8.     Closure of San Lorenzo Park and the Benchlands, at this time, without providing adequate and available shelter space for every homeless individual has and will continue to result in the dispersal of a population already at greatly heightened risk for COVID-19. Already, as a direct result of "Phase One," of the City's plan, individuals previously encamped at San Lorenzo Park have been observed alone, sleeping in downtown doorways and in residential neighborhoods where they are at heightened risk, particularly in the case of homeless women, including Plaintiffs Avalos and Hegel.

9.     If Defendants are not restrained, the closure of these homeless encampments will separate hundreds of people from an area where they have had access to food, clothing, vital hygiene necessities and other support and the relative physical security of a community. Not only will the homeless be placed at heighted risk, made to wander the streets, congregate with people they do not know and become hidden such that medical attention becomes impossible but so will the public at large since, as the CDC states, the breakup of homeless encampments "contributes to community spread."

10.     For this reason, and those additionally set forth below, Plaintiffs pray that this Court will grant the relief sought.

### JURISDICTION AND VENUE

11.     This is an action for injunctive relief pursuant to 42 USC Section1983 and F.R.Civ.P. 23(b)(2) based upon ongoing violations and the imminent harm to homeless residents of San Lorenzo Park in the City of Santa Cruz, California based upon the violation of rights secured to the Plaintiffs by the Eighth and Fourteenth Amendments to the Constitution of the United States Constitution as well as pandemic-related health protections ordered by the State of California and

*Ex Parte* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND COMPLAINT

1 the Santa Cruz County Health Officer. Jurisdiction exists based on 28 U.S.C. Section 1331 and

2 1343 in that this case is brought pursuant to 42 U.S.C. Section 1983 and raises questions of federal

3 constitutional law under the Eighth and Fourteenth Amendments. Jurisdiction also exists under the

4 Declaratory Judgment Act, 28 U.S.C. Sections 2201(a) and 2202.

5 **INTRADISTRICT ASSIGNMENT**

6     12.    Because this action arises in Santa Cruz County it is assigned to the San Jose

7 Division. Venue is proper in the Northern District in that the events and conduct complained of in

8 this action are occurring in the Northern District.

9

10 **PARTIES**

**Plaintiffs:**

11

12     13.    Plaintiff **SANTA CRUZ HOMELESS UNION** ("Homeless Union" or "the Union")

13 is an unincorporated association of homeless and housing-insecure families, individuals and

14 advocates, a member local of the California Homeless Union/Statewide Organizing Council,

15 affiliated with the National Union of the Homeless. The Union's mission is to organize, represent

16 and serve the Santa Cruz homeless community. The majority of its officers and members live in

17 homeless encampments. Due to the policy and practice of "sweeping" the homeless and clearing

18 homeless encampments, Defendants, and each of them, continue to directly interfere with the

19 Union's survival and representational programs during the COVID-19 pandemic. The Union brings

20

21 this suit on behalf of itself and on behalf of its members and other homeless residents of San

22 Lorenzo Park and the Benchlands.

23     14.    Plaintiff **SANTA CRUZ FOOD NOT BOMBS** is a non-profit organization of

24 community volunteers who prepare and serve thousands of meals year-round to the homeless and

25 others who are experiencing hunger in Santa Cruz and, specifically, has provided food to unhoused

26 persons living in San Lorenzo Park and the Benchlands. Due to the policy and practice of

27 "sweeping" the homeless and clearing homeless encampments, Defendants, and each of them,

28

*Ex Parte* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND COMPLAINT

continue to directly interfere with the mission of Santa Cruz Food Not Bombs with the result that homeless and other indigent persons are going without meals.

15.    Plaintiff **ALICIA AVALOS** is a 24-year-old homeless Latinx female and member of the Santa Cruz Homeless Union who has resided in a tent in San Lorenzo Park for five months. She relies upon Food Not Bombs for her meals. She fears for her physical safety –specifically, sexual assault or rape—if she is forced out of the relative safety of the homeless encampment and into more isolated sections of Santa Cruz County. She has never been offered any services, motel vouchers, or rooms. If she is forced to leave the encampment, she will not be able to carry all of the items she owns and needs to survive the winter and fears that she may be forced to leave behind clothing, bedding, hygiene items and other personal property that would almost certainly be destroyed by employees or agents of Defendant City of Santa Cruz as has happened in the past. Most important, if she is forced out of the encampment she fears that she may be placed at risk of infection from COVID-19.

16.    Plaintiff **HANNAH HEGEL** is a 25-year-old female and member of the Santa Cruz Homeless Union who volunteers with Food Not Bombs and has been residing at San Lorenzo Park for several months. She relies on Food Not Bombs and other organizations that bring in necessities and survival materials. She fears for her physical safety –specifically, sexual assault or rape—if she is forced out of the relative safety of the homeless encampment and into more isolated sections of Santa Cruz County. She has never been offered any services, motel vouchers, or rooms. If she is forced to leave the encampment, she will not be able to carry all of the items she owns and needs to survive the winter and fears that she may be forced to leave behind clothing, bedding, hygiene items and other personal property that would almost certainly be destroyed by employees or agents of Defendant City of Santa Cruz as has happened in the past. Most important, if she is forced out of the encampment she fears that she may be placed at increased risk of infection from COVID-19.

17.    Plaintiff **RANDOLPH TOLLEY**, 56, is a member of the Santa Cruz Homeless Union who has been at San Lorenzo Park for approximately three months. He has never been offered any services, motel vouchers, or rooms. If is forced to leave the encampment, he will not be able to carry all of the items he owns and needs to survive the winter and fears that he may be forced to leave behind clothing, bedding, hygiene items and other personal property that would almost certainly be destroyed by employees or agents of Defendant City of Santa Cruz as has happened in the past. Most important, if he is forced out of the encampment, he fears that he may be placed at increased risk of infection from COVID-19.

18.    Plaintiff **CHRIS INGERSOLL**, 26, is a homeless male and member of the Santa Cruz Homeless Union who has been at San Lorenzo Park for approximately five months. He relies upon Food Not Bombs for meals. If he is forced to leave the encampment, he will not be able to carry all of the items he owns and needs to survive the winter and fears that he may be forced to leave behind clothing, bedding, hygiene items and other personal property that would almost certainly be destroyed by employees or agents of Defendant City of Santa Cruz as has happened in the past. Most important, if he is forced out of the encampment, he fears that he may be placed at risk of infection from COVID-19.

**Defendants**

19.    Defendant **City of Santa Cruz** is a municipal corporation existing under the laws of the State of California, with the capacity to sue and be sued.

20.    Defendant **Martin Bernal** is the Santa Cruz City Manager and is sued in both his individual and official capacities.

21.    Defendant **Tony Elliot** is the City of Santa Cruz Director of Parks & Recreation and is sued in both his individual and official capacities.

**MEMORANDUM OF POINTS AND AUTHORITIES**

*Ex Parte* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND COMPLAINT

22.    Pursuant to Local Rule 65.1(a), plaintiffs respectfully move for a temporary restraining order against Defendants City of Santa Cruz, Martin Bernal and Tony Elliot to halt the closure of San Lorenzo Park and the area known as "the Benchlands" where some 150 homeless persons have been camped since the outbreak of the COVID-19 pandemic. Specifically, Plaintiffs seek: 1) a TRO preventing Defendants from removing homeless persons and closing the Park and the Benchlands and; 2) an order permitting a right of return to those who have been forcibly removed and placed at vastly increased risk of harm by way of exposure to and community spread of the coronavirus.

23.    A TRO is necessary to prevent irreparable harm to homeless plaintiffs prior to this Court having an opportunity to make a decision on Plaintiffs' motion for a preliminary injunction. On December 18, 2020, prior to bringing this action, plaintiff Sacramento Homeless Union President Alicia Kuhl contacted Santa Cruz City Attorney Tony Condotti via email urging that the City cease and desist from closing the Park and evicting the homeless residents. The City Attorney did not respond. In addition, undersigned counsel wrote the City Attorney today but did not receive a response as of the filing of this Complaint. Accordingly, Plaintiff respectfully requests that the Court grant its motion for a TRO. A proposed order is submitted herewith.

**STANDARD OF REVIEW**

24.    In deciding an application for a preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure, courts in the Ninth Circuit look to the following factors: a) The movant has shown a likelihood of success on the merits; b) There is a likelihood that the movant will suffer irreparable harm in absence of a preliminary injunction; c) The balance of equities tips in the movant's favor; d) The injunction is in the public interest. *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009).

1

**Plaintiffs Are Likely to Succeed on the Merits; Alternatively, Under the Ninth Circuit's** *Alliance For The Wild Rockies v. Cottrell,* **Plaintiffs Raise "Serious Questions" Going to the Merits**

2

3      25.    To determine whether to issue a TRO, the courts in the Ninth Circuit apply the same

4    analysis used to evaluate a motion for preliminary injunction. *McCarthy v. Servis One, Inc.*, 2017

5    U.S. Dist. LEXIS 32622, at *9–10 (N.D. Cal. Mar. 7, 2017). A party seeking a preliminary

6
7    injunction in the Ninth Circuit must meet one of two variants of the same standard. First, a party can

8    show that he or she is likely to succeed on the merits, that he or she is likely to suffer irreparable

9    harm in the absence of preliminary relief, that the balance of equities tips in his or her favor, and

10    that an injunction is in the public interest. *Alliance For The Wild Rockies v. Pena,* 865 F.3d 1211,

11    1217 (9th Cir. 2017).

12      26.    Alternatively, under the sliding scale variant of the standard, if a plaintiff can only

13    show that there are *"serious questions going to the merits"*—a lesser showing than likelihood of

14
15    success on the merits—then a preliminary injunction may still issue if the balance of hardships tips

16    sharply in the plaintiff's favor, and the other two factors are satisfied. *Alliance For The Wild*

17    *Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). These two alternatives are at the ends of a

18    single continuum rather than two separate tests. *Immigrant Assistant Project of Los Angeles County*

19    *Fed'n of Labor v. INS*, 306 F.3d 842, 873 (9th Cir. 2002).

20      27.    Here, Plaintiffs' Complaint and Application for a TRO raises serious questions

21    including the legality, under the Federal and State Constitutional rights as well as state and local

22
23    public health orders, of Defendants' plan to expel the homeless from the San Lorenzo and

24    Benchlands encampments when it is undisputed that the shelters are full and COVID-19 infections

25    and fatalities are mounting. As the Centers for Disease Control (CDC) expressly warns, "If

26    individual housing options are not available, allow people who are living unsheltered or in

27    encampments to remain where they are. *Clearing encampments can cause people to disperse*

28

*Ex Parte* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND COMPLAINT

1 | *throughout the community and break connections with service providers. This increases the*
2 | *potential for infectious disease spread."* (Exhibit F)(Emphasis added.)

3 | In addition, serious questions arise regarding state-created danger by way of affirmatively
4 | increasing the risk of harm and even death faced routinely by homeless persons—particularly
5 | females deprived of the relative safety of the encampment community and the material support
6 |
7 | rendered by charitable organizations and ordinary citizens. Indeed, two of the named plaintiffs in
8 | this action are women in their early 20's.

9 | 28. Here, where it is undisputed that there are no shelters or individual housing options
10 | available, Defendants act in flagrant disregard of the CDC guidelines, but more particularly, in
11 | disregard of the Santa Cruz County Health Officer whose condemnation of the City's plan has been
12 | widely reported. "This [the decision to clear the San Lorenzo and Benchlands encampments] was a
13 | decision of the City of Santa Cruz. [County]Public Health as not consulted about this," writes Dr.
14 | Gail Newel. "[W]e would have advised against this[.]" (Exhibit G)
15 |
16 | 29. To sum up, Plaintiffs have met their burden of demonstrating either a "fair chance of
17 | success on the merits" or, alternatively and at the least, "questions *serious enough to require*
18 | *litigation*. *Guzman v. Shewry*, 552 F.3d 941, 948 (9th Cir. 2009) (Emphasis added.)

19 | **The Harm to Plaintiffs is Both Irreparable and Imminent**

20 | 30. To support injunctive relief, harm must not only be irreparable, it must be imminent;
21 | a threat of irreparable harm in the indefinite future is not enough. Rather, a plaintiff must
22 |
23 | demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief. *Amylin*
24 | *Pharm., Inc. v. Eli Lilly & Co.*, 456 F. App'x 676, 679 (9th Cir. 2011).

25 | 31. To demonstrate immediate threatened injury as a prerequisite to preliminary
26 | injunctive relief, a plaintiff must proffer probative evidence that the threatened injury is imminent
27 | and irreparable. *Rubin ex rel. NLRB v. Vista Del Sol Health Servs., Inc.*, 80 F. Supp. 3d 1058, 1100-
28 | 01 (C.D. Cal. 2015). Here, the undisputed evidence that the threatened injury is imminent is shown

by the decision announced by Defendants on December 17, 2020 --and now already underway --to clear the encampments in question in defiance of Federal and Santa Cruz CountyCOVID-19 guidelines respecting the unsheltered.

32.    Here, that the threatened injury is irreparable can hardly be disputed. There is no cure for COVID-19 which, it is now established, can lead not only to serious illness and death, but to permanent disabilities including loss of vital senses as well as increased vulnerability to underlying conditions and new disabilities such as heart disease. (Exhibit H). "Speculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant." *Inland Steel Co. v. United States*, 306 U.S. 153, 156 (1939); *Deckert v. Independence Shares Corp.*, 311 U.S. 282, 290 (1940). In *Winter v. Natural Resources Defense Council, Inc*. 555 U.S. 7 the Court reiterated the general standard and held that a "mere possibility" of irreparable harm is insufficient to warrant a preliminary injunction. Here, the threatened injury is hardly speculative and far more than a "mere possibility." Accordingly, Plaintiffs have met this element of the test for preliminary injunction.

### The Balance of Interim Harms Tips Heavily in Plaintiffs' Favor

33.    The court must evaluate the interim harm the defendants are likely to sustain if the injunction is granted and compare it with the harm the plaintiff is likely to suffer if an injunction does not enter. *De Vico v. United States Bank*, 2012 U.S. Dist. LEXIS 155622, at *22 (C.D. Cal. Oct. 29, 2012).

34.    The real issue is the degree of harm that will be suffered by the plaintiff or the defendant if the injunction is improperly granted or denied. *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 284 (4th Cir. 2002). If a plaintiff can only show that there are serious questions going to the merits—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the balance of hardships tips sharply in the plaintiff's favor and the

1   other two *Winter* factors are satisfied. *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291

2   (9th Cir. 2013)

3       35.     Here, in the Memorandum and Order of December 17, 2020, Defendants provide a

4   laundry list of alleged conditions at San Lorenzo Park justifying its closure. Plaintiffs dispute these

5   representations as a combination of exaggerated, non-existent and, in the case of the oft-repeated

6   complaint of trash and debris—a product of the City's own negligence in having removed

7   previously installed and serviced trash containers and sanitary facilities.

8
9       36.     But even accepting the proffered justifications as true—which Plaintiffs do not--

10  every one of these conditions could be remedied without forcing the homeless out -- in defiance of

11  federal, state and county health orders and guidelines -- into a deepening deadly pandemic. The

12  "hardships" that Defendant's might point to in opposing Plaintiffs' application are largely self-

13  created and, in any case, pale by comparison with those faced by those evicted from the

14  encampments with no where to go.

15
16          **The Injunction Is In The Public Interest Because, as the CDC Warns, Clearing**
            **Homeless Encampments Increases the Potential for Infectious Disease Spread**

17      37.     The public interest analysis for the issuance of a preliminary injunction requires the

18  Court to consider whether there exists some critical public interest that would be injured by the

19
20  grant of preliminary relief. *Collins v. Brewer*, 727 F. Supp. 2d 797, 814 (D. Ariz. 2010).

21      38.     Here, *there is no public interest that would be injured by the grant of an injunction.*

22  On the contrary: it is in the interests of the general public that it be protected from community

23  spread of the coronavirus, a consequence of clearing homeless encampments expressly identified by

24  the CDC as discussed above.  In short, Plaintiffs have satisfied their burden for the issuance of a

25  TRO and Preliminary Injunction and pray this Court will grant Plaintiff's *Ex Parte* Application.

26
27
28

*Ex Parte* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND COMPLAINT

**CLAIMS FOR RELIEF**

## FIRST CLAIM FOR RELIEF

State-Created Danger in Violation of Due Process Guarantee Under the U.S. Constitution
U.S. Const., Amend. XIV; 42 U.S.C. § 1983

39.    Plaintiffs reincorporate by reference each of the preceding paragraphs and allegations as if fully set forth herein.

40.    Under the 14th Amendment to the U.S. Constitution, no state can "deprive any person of life, liberty or property without due process of law." This federal constitutional provision confers upon Plaintiffs a right to be free from a deprivation of their due process rights by Defendants.

41.    Under 42 U.S.C. Section 1983, "[e]very person who, under color of any statute, regulation custom, or usage, of any State or Territory or the District of Columbia, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party inured in an action at law…"

42.    As part of this right, Defendants are prohibited from affirmatively placing Plaintiffs in known or obvious danger under an objective deliberate indifference standard.

43.    By clearing the homeless encampments in San Lorenzo Park and the Benchlands and failing to provide alternative safe housing, where those acts have made Plaintiffs and other similarly situated unhoused persons at greater risk of COVID-19 infection, injury and death, Defendants have affirmatively placed and continue to place Plaintiffs in known or obvious danger.

44.    Accordingly, Defendants have subjected Plaintiffs to state-created danger in violation of the 14th Amendment to the U.S. Constitution and 42 U.S.C. § 1983.

## SECOND CLAIM FOR RELIEF

State-Created Danger in Violation of Due Process Guarantees Under the California Constitution
Cal.Const. Ar. I §7

*Ex Parte* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND COMPLAINT

45.     Plaintiffs reincorporate by reference each of the preceding paragraphs and allegations as if fully set forth herein.

46.     Under Article I, Section 7 of the California Constitution "A persons may not be deprived of life, liberty or property without due process of law." This state constitutional provision confers upon Plaintiffs a right to be free from a deprivation of their due process rights by Defendants.

47.     As part of this right, Defendants are prohibited from affirmatively placing Plaintiffs in known or obvious danger under an objective deliberate indifference standard.

48.     By clearing the homeless encampments in San Lorenzo Park and the Benchlands and failing to provide alternative safe housing, where those acts have made Plaintiffs and other similarly situated unhoused persons at greater risk of COVID-19 infection, injury and death, Defendants have affirmatively placed and continue to place Plaintiffs in known or obvious danger.

**JURY DEMANDED**

**PRAYER FOR RELIEF**

49.     Plaintiffs reincorporate by reference each of the preceding paragraphs and allegations as if fully set forth herein:

50.     Plaintiffs respectfully request that this Court order the following:

(a) Grant a Temporary Restraining Order, Preliminary Injunction or Permanent Injunction immediately enjoining Defendants and each of them from closing San Lorenzo Park and/or the Benchlands or otherwise removing homeless persons from said locations unless and until each person/family is actually provided -- in real-time -- with safe, indoor individual housing, consistent with CDC guidelines.

*Ex Parte* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND COMPLAINT

(b) Order Defendants to rescind the "Memorandum and Order" of December 17, 2020 and permit homeless persons who have been displaced from San Lorenzo Park and/or the Benchlands to return to the locations.

(c) Order Defendants and each of them to strictly observe Federal (CDC), California State and Santa Cruz County Public Health Orders and guidelines regarding homeless encampments.

(d) That the Court retain jurisdiction and exercise oversight as to Defendants' compliance with its Orders.

(e) That the Court award reasonable attorney's fees to Plaintiffs' counsel

(f) Any further relief this Court deems appropriate.

Dated: December 29, 2020                    Respectfully Submitted,

                                           __/s/ Anthony D. Prince_____

                                           Anthony D. Prince,
                                           General Counsel, California Homeless Union
                                           Law Offices of Anthony D. Prince,
                                           Attorneys for Plaintiffs

## VERIFICATION

I, Alicia Kuhl, in my official capacity as President of the Santa Cruz Homeless Union, lead Plaintiff in the above-captioned action, declare the following:

The facts alleged in this Complaint and *Ex Parte* Application for a Temporary Restraining Order -- including the fact that individual plaintiffs Avalos, Hegel, Ingersoll and Tolley are members of the Santa Cruz Homeless Union--are true of my own knowledge, except those statements made upon information and belief and, as to such statements, I believe them to be true.

Sworn under penalty of perjury under the laws of the United States of America

Dated: December 29, 2020                    _____

At Santa Cruz, California                   /s/ Alicia Kuhl

*Ex Parte* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND COMPLAINT

1   Anthony D. Prince (SBN # 202892)
    General Counsel, California Homeless Union/Statewide Organizing Council
2   Law Offices of Anthony D. Prince
    2425 Prince Street, Ste. 100
3   Berkeley, CA 94705
    Tel: 510-301-1472
4
                                                                            Page
5   Attorneys for Plaintiffs                                                - 1 -
                            **UNITED STATES COURT**
6
                      **NORTHERN DISTRICT OF CALIFORNIA**
7

8   SANTA CRUZ HOMELESS UNION, on          )   **Case No.:**
    behalf of itself and those it represents; SANTA )
9   CRUZ FOOD NOT BOMBS; ALICIA            )   ***Ex Parte* APPLICATION FOR**
    AVALOS, HANNAH HEGEL, CHRIS            )   **EMERGENCY TEMPORARY**
10  INGERSOLL and RANDOLPH TOLLEY, on )       **RESTRAINING ORDER and**
    behalf of themselves and similarly situated )  **PRELIMINARY INJUNCTION TO HALT**
11  homeless persons,                      )   **CLOSING OF SAN LORENZO PARK**
                                           )   **AND THE BENCHLANDS HOMELESS**
12              Plaintiffs                 )   **ENCAMPMENTS and ORDERING**
                                           )   **COMPLIANCE WITH STATE AND**
13          vs.                            )   **COUNTY COVID-19 PUBLIC HEALTH**
                                           )   **ORDERS; COMPLAINT FOR**
14                                         )   **INJUNCTIVE RELIEF UNDER the**
    CITY OF SANTA CRUZ, MARTIN             )   **FOURTEENTH AMENDMENTS TO THE**
15  BERNAL, individually and in his official )  **U.S. CONSTITUTION, 42 U.S.C. § 1983**
    capacity as City Manager for the City of Santa )  **AND CALIFORNIA CONSTITUTION**
16  Cruz; TONY ELLIOT, individually and in his )  **ART.1, § 7;**
    capacity as Director of Director of Parks & )  **DECLARATION OF ANTHONY D.**
17  Recreation for the City of Santa Cruz; )   **PRINCE;**
    ANDREW MILLS, individually and in his  )   **[Proposed] ORDER**
18  capacity as Chief of Police for the City of )
    Santa Cruz,                            )
19                                         )
                                           )
20              Defendants                 )
                                           )
21

22                  **INTRODUCTION AND BACKGROUND**

23          1.      Individual homeless plaintiffs **ALICIA AVALOS**, **HANNAH HEGEL, CHRIS**

24  **INGERSOLL** and **RANDOLPH TOLLEY** and organizational plaintiffs **SANTA CRUZ**

25  **HOMELESS UNION** and **SANTA CRUZ FOOD NOT BOMBS**, ("Plaintiffs") bring this

26
    Emergency Action for a Temporary Restraining Order and Preliminary Injunction against **City Of**
27
28  **Santa Cruz**, and in both their individual and official capacities, respectively, Santa Cruz City

    *Ex Parte* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND COMPLAINT

Manager **Martin Bernal**, Director of Parks & Recreation Tony Elliot and Chief of Police **Andrew Mills** (collectively, "Defendants") to enjoin Defendants' unlawful closure of San Lorenzo Park and "the Benchlands" where close to 200 homeless persons have been encamped, fed and provided with life-saving survival items for over six months and now face separation from such vital services and eviction into the streets and wooded parts of Santa Cruz County as COVID-19 infections and deaths reach record levels.

Pag - 2 -

    2.      On December 3, 2020, the California Department of Public Health issued a "Regional Stay at Home Order" signed by Erica S. Pan, MD, MPH, Acting State Public Health Officer, which called attention to the dramatic worsening and unprecedented increase in the rate of increase in COVID-19 infections and fatalities. The Order commanded, among other things, that when Intensive Care Unit capacity falls below 15%, "all individuals living in the Region shall stay at home ***or at their place of residence*** except as necessary to conduct activities associated with the operation, maintenance or usage of critical infrastructure […]. (Exhibit A)(Emphasis added.) The order did not provide an exception for homeless persons.

    3.      On December 16, 2020, the Health Services Agency of the County of Santa Cruz issued a Press Release announcing that based on data released by the State of California showing ICU bed availability had fallen below the 15% threshold, "the Regional Stay-at-Home Order" would commence the next day, December 17, 2020. (Exhibit B) The Press Release quoted Santa Cruz County Health Officer Dr. Gail Newel: "We urge all residents to ***adhere to state guidelines*** as closely as possible to ***minimize the spread of COVID-19*** and help ***reduce impacts to our most vulnerable residents."*** The Health Services Agency statement did not provide an exception for homeless persons; on the contrary, as quoted above, the County Health Officer made a public call to "reduce impacts to our most vulnerable residents."

    4.      The very next day, December 17, 2020, Defendants Santa Cruz City Manager Martin Bernal and Parks & Recreation Director Tony Elliot, issued a "Memorandum and Order" (Exhibit

*Ex Parte* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND COMPLAINT

C) announcing their intention to close San Lorenzo Park as well as an area known as "the Benchlands" which is adjacent to San Lorenzo Park. Plaintiffs vigorously dispute Defendants' inaccurate and pretextual description of the conditions at these areas as alleged in the Memorandum and Order as the City's justification for removing homeless persons and closing the park.

5.     The next day, Dr. Gail Newel, the Santa Cruz County Health Officer, publicly replied to an inquiry posted on Facebook from community activist Abbi Dale. (Exhibit D) Dale wrote and asked Dr. Newel to "let [her] know why the City is evicting people at the [San Lorenzo Park] encampment against CDC Guidelines?"  County Health Officer Newel immediately replied to Abbi Dale writing, "I agree with you and share your concerns. This was a decision of the City of Santa Cruz, independent of the County, for which I work. ***Public Health was not consulted about this. If we had been, we would have advised against this for the very reasons you cite.***" (Emphasis added.)

6.     On December 18, 2020, Plaintiff Santa Cruz Homeless Union President Alicia Kuhl sent a "Cease and Desist" Letter to City Manager Martin Bernal, Parks & Recreation Director Tony Elliot, City Attorney Tony Condotti  and all members of the Santa Cruz City Council in which she requested that "[The City of Santa Cruz] CEASE AND DESIST from the closure of San Lorenzo Park and the Benchlands which included a verbatim recitation of the CDC guidelines prohibiting the clearing of homeless encampments where individual housing options are not available. (Exhibit E).  Homeless Union President Kuhl did not receive a single reply.

7.     On the morning of December 29, 2020, Counsel for Plaintiffs sent a meet and confer email to City Attorney Tony Condotti requesting that the City of Santa Cruz suspend further clearing of San Lorenzo Park and the Benchlands and urging that all impacted parties discuss resolution of the situation. City Attorney Condotti was further advised that if the City did not halt the clearing of the encampments, Plaintiffs would immediately avail themselves of all available

legal remedies. Mr. Condotti did not reply to Counsel for Plaintiffs communication. (See, Exhibit A to Declaration of Anthony D. Prince)

8.    Closure of San Lorenzo Park and the Benchlands, at this time, without providing adequate and available shelter space for every homeless individual has and will continue to result in the dispersal of a population already at greatly heightened risk for COVID-19. Already, as a direct result of "Phase One," of the City's plan, individuals previously encamped at San Lorenzo Park have been observed alone, sleeping in downtown doorways and in residential neighborhoods where they are at heightened risk, particularly in the case of homeless women, including Plaintiffs Avalos and Hegel.

9.    If Defendants are not restrained, the closure of these homeless encampments will separate hundreds of people from an area where they have had access to food, clothing, vital hygiene necessities and other support and the relative physical security of a community. Not only will the homeless be placed at heighted risk, made to wander the streets, congregate with people they do not know and become hidden such that medical attention becomes impossible but so will the public at large since, as the CDC states, the breakup of homeless encampments "contributes to community spread."

10.    For this reason, and those additionally set forth below, Plaintiffs pray that this Court will grant the relief sought.

### JURISDICTION AND VENUE

11.    This is an action for injunctive relief pursuant to 42 USC Section1983 and F.R.Civ.P. 23(b)(2) based upon ongoing violations and the imminent harm to homeless residents of San Lorenzo Park in the City of Santa Cruz, California based upon the violation of rights secured to the Plaintiffs by the Eighth and Fourteenth Amendments to the Constitution of the United States Constitution as well as pandemic-related health protections ordered by the State of California and

*Ex Parte* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND COMPLAINT

the Santa Cruz County Health Officer.  Jurisdiction exists based on 28 U.S.C. Section 1331 and

1343 in that this case is brought pursuant to 42 U.S.C. Section 1983 and raises questions of federal

constitutional law under the Eighth and Fourteenth Amendments. Jurisdiction also exists under the

Declaratory Judgment Act, 28 U.S.C. Sections 2201(a) and 2202.

Page - 5 -

## INTRADISTRICT ASSIGNMENT

12.    Because this action arises in Santa Cruz County it is assigned to the San Jose

Division. Venue is proper in the Northern District in that the events and conduct complained of in

this action are occurring in the Northern District.

## PARTIES

**Plaintiffs:**

13.    Plaintiff **SANTA CRUZ HOMELESS UNION** ("Homeless Union" or "the Union")

is an unincorporated association of homeless and housing-insecure families, individuals and

advocates, a member local of the California Homeless Union/Statewide Organizing Council,

affiliated with the National Union of the Homeless. The Union's mission is to organize, represent

and serve the Santa Cruz homeless community. The majority of its officers and members live in

homeless encampments. Due to the policy and practice of "sweeping" the homeless and clearing

homeless encampments, Defendants, and each of them, continue to directly interfere with the

Union's survival and representational programs during the COVID-19 pandemic. The Union brings

this suit on behalf of itself and on behalf of its members and other homeless residents of San

Lorenzo Park and the Benchlands.

14.    Plaintiff **SANTA CRUZ FOOD NOT BOMBS** is a non-profit organization of

community volunteers who prepare and serve thousands of meals year-round to the homeless and

others who are experiencing hunger in Santa Cruz and, specifically, has provided food to unhoused

persons living in San Lorenzo Park and the Benchlands. Due to the policy and practice of

"sweeping" the homeless and clearing homeless encampments, Defendants, and each of them,

*Ex Parte* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND COMPLAINT

1   continue to directly interfere with the mission of Santa Cruz Food Not Bombs with the result that

2   homeless and other indigent persons are going without meals.

3       15.    Plaintiff **ALICIA AVALOS** is a 24-year-old homeless Latinx female and member of

4   the Santa Cruz Homeless Union who has resided in a tent in San Lorenzo Park for five months. She

5   relies upon Food Not Bombs for her meals. She fears for her physical safety –specifically, sexual

6   assault or rape—if she is forced out of the relative safety of the homeless encampment and into

7   more isolated sections of Santa Cruz County. She has never been offered any services, motel

8   vouchers, or rooms. If she is forced to leave the encampment, she will not be able to carry all of the

9   items she owns and needs to survive the winter and fears that she may be forced to leave behind

10  clothing, bedding, hygiene items and other personal property that would almost certainly be

11  destroyed by employees or agents of Defendant City of Santa Cruz as has happened in the past.

12  Most important, if she is forced out of the encampment she fears that she may be placed at risk of

13  infection from COVID-19.

14

15

16      16.    Plaintiff **HANNAH HEGEL** is a 25-year-old female and member of the Santa Cruz

17  Homeless Union who volunteers with Food Not Bombs and has been residing at San Lorenzo Park

18  for several months. She relies on Food Not Bombs and other organizations that bring in necessities

19  and survival materials. She fears for her physical safety –specifically, sexual assault or rape—if she

20  is forced out of the relative safety of the homeless encampment and into more isolated sections of

21  Santa Cruz County. She has never been offered any services, motel vouchers, or rooms. If she is

22  forced to leave the encampment, she will not be able to carry all of the items she owns and needs to

23  survive the winter and fears that she may be forced to leave behind clothing, bedding, hygiene items

24  and other personal property that would almost certainly be destroyed by employees or agents of

25  Defendant City of Santa Cruz as has happened in the past. Most important, if she is forced out of the

26  encampment she fears that she may be placed at increased risk of infection from COVID-19.

27

28

*Ex Parte* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND COMPLAINT

17.    Plaintiff **RANDOLPH TOLLEY**, 56, is a member of the Santa Cruz Homeless Union who has been at San Lorenzo Park for approximately three months. He has never been offered any services, motel vouchers, or rooms. If he is forced to leave the encampment, he will not be able to carry all of the items he owns and needs to survive the winter and fears that he may be forced to leave behind clothing, bedding, hygiene items and other personal property that would almost certainly be destroyed by employees or agents of Defendant City of Santa Cruz as has happened in the past. Most important, if he is forced out of the encampment, he fears that he may be placed at increased risk of infection from COVID-19.

18.    Plaintiff **CHRIS INGERSOLL**, 26, is a homeless male and member of the Santa Cruz Homeless Union who has been at San Lorenzo Park for approximately five months. He relies upon Food Not Bombs for meals. If he is forced to leave the encampment, he will not be able to carry all of the items he owns and needs to survive the winter and fears that he may be forced to leave behind clothing, bedding, hygiene items and other personal property that would almost certainly be destroyed by employees or agents of Defendant City of Santa Cruz as has happened in the past. Most important, if he is forced out of the encampment, he fears that he may be placed at risk of infection from COVID-19.

**Defendants**

19.    Defendant **City of Santa Cruz** is a municipal corporation existing under the laws of the State of California, with the capacity to sue and be sued.

20.    Defendant **Martin Bernal** is the Santa Cruz City Manager and is sued in both his individual and official capacities.

21.    Defendant **Tony Elliot** is the City of Santa Cruz Director of Parks & Recreation and is sued in both his individual and official capacities.

**MEMORANDUM OF POINTS AND AUTHORITIES**

*Ex Parte* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND COMPLAINT

22.    Pursuant to Local Rule 65.1(a), plaintiffs respectfully move for a temporary restraining order against Defendants City of Santa Cruz, Martin Bernal and Tony Elliot to halt the closure of San Lorenzo Park and the area known as "the Benchlands" where some 150 homeless persons have been camped since the outbreak of the COVID-19 pandemic. Specifically, Plaintiffs seek: 1) a TRO preventing Defendants from removing homeless persons and closing the Park and the Benchlands and; 2) an order permitting a right of return to those who have been forcibly removed and placed at vastly increased risk of harm by way of exposure to and community spread of the coronavirus.

23.    A TRO is necessary to prevent irreparable harm to homeless plaintiffs prior to this Court having an opportunity to make a decision on Plaintiffs' motion for a preliminary injunction. On December 18, 2020, prior to bringing this action, plaintiff Sacramento Homeless Union President Alicia Kuhl contacted Santa Cruz City Attorney Tony Condotti via email urging that the City cease and desist from closing the Park and evicting the homeless residents. The City Attorney did not respond. In addition, undersigned counsel wrote the City Attorney today but did not receive a response as of the filing of this Complaint. Accordingly, Plaintiff respectfully requests that the Court grant its motion for a TRO. A proposed order is submitted herewith.

## STANDARD OF REVIEW

24.    In deciding an application for a preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure, courts in the Ninth Circuit look to the following factors: a) The movant has shown a likelihood of success on the merits; b) There is a likelihood that the movant will suffer irreparable harm in absence of a preliminary injunction; c) The balance of equities tips in the movant's favor; d) The injunction is in the public interest. *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009).

*Ex Parte* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND COMPLAINT

**Plaintiffs Are Likely to Succeed on the Merits; Alternatively, Under the Ninth Circuit's** *Alliance For The Wild Rockies v. Cottrell,* **Plaintiffs Raise "Serious Questions" Going to the Merits**

25.    To determine whether to issue a TRO, the courts in the Ninth Circuit apply the same analysis used to evaluate a motion for preliminary injunction. *McCarthy v. Servis One, Inc.*, 2017 U.S. Dist. LEXIS 32622, at *9–10 (N.D. Cal. Mar. 7, 2017). A party seeking a preliminary injunction in the Ninth Circuit must meet one of two variants of the same standard. First, a party can show that he or she is likely to succeed on the merits, that he or she is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his or her favor, and that an injunction is in the public interest. *Alliance For The Wild Rockies v. Pena,* 865 F.3d 1211, 1217 (9th Cir. 2017).

26.    Alternatively, under the sliding scale variant of the standard, if a plaintiff can only show that there are *"serious questions going to the merits"*—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the balance of hardships tips sharply in the plaintiff's favor, and the other two factors are satisfied. *Alliance For The Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). These two alternatives are at the ends of a single continuum rather than two separate tests. *Immigrant Assistant Project of Los Angeles County Fed'n of Labor v. INS*, 306 F.3d 842, 873 (9th Cir. 2002).

27.    Here, Plaintiffs' Complaint and Application for a TRO raises serious questions including the legality, under the Federal and State Constitutional rights as well as state and local public health orders, of Defendants' plan to expel the homeless from the San Lorenzo and Benchlands encampments when it is undisputed that the shelters are full and COVID-19 infections and fatalities are mounting. As the Centers for Disease Control (CDC) expressly warns, "If individual housing options are not available, allow people who are living unsheltered or in encampments to remain where they are. ***Clearing encampments can cause people to disperse***

*Ex Parte* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND COMPLAINT

*throughout the community and break connections with service providers. This increases the potential for infectious disease spread."* (Exhibit F)(Emphasis added.)

In addition, serious questions arise regarding state-created danger by way of affirmatively increasing the risk of harm and even death faced routinely by homeless persons—particularly females deprived of the relative safety of the encampment community and the material support rendered by charitable organizations and ordinary citizens. Indeed, two of the named plaintiffs in this action are women in their early 20's.

28.    Here, where it is undisputed that there are no shelters or individual housing options available, Defendants act in flagrant disregard of the CDC guidelines, but more particularly, in disregard of the Santa Cruz County Health Officer whose condemnation of the City's plan has been widely reported. "This [the decision to clear the San Lorenzo and Benchlands encampments] was a decision of the City of Santa Cruz. [County]Public Health as not consulted about this," writes Dr. Gail Newel. "[W]e would have advised against this[.]" (Exhibit G)

29.    To sum up, Plaintiffs have met their burden of demonstrating either a "fair chance of success on the merits" or, alternatively and at the least, "questions *serious enough to require litigation*. *Guzman v. Shewry*, 552 F.3d 941, 948 (9th Cir. 2009) (Emphasis added.)

### The Harm to Plaintiffs is Both Irreparable and Imminent

30.    To support injunctive relief, harm must not only be irreparable, it must be imminent; a threat of irreparable harm in the indefinite future is not enough. Rather, a plaintiff must demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief. *Amylin Pharm., Inc. v. Eli Lilly & Co.*, 456 F. App'x 676, 679 (9th Cir. 2011).

31.    To demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief, a plaintiff must proffer probative evidence that the threatened injury is imminent and irreparable. *Rubin ex rel. NLRB v. Vista Del Sol Health Servs., Inc.*, 80 F. Supp. 3d 1058, 1100-01 (C.D. Cal. 2015). Here, the undisputed evidence that the threatened injury is imminent is shown

*Ex Parte* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND COMPLAINT

by the decision announced by Defendants on December 17, 2020 --and now already underway --to clear the encampments in question in defiance of Federal and Santa Cruz CountyCOVID-19 guidelines respecting the unsheltered.

Pag
- 11

32.     Here, that the threatened injury is irreparable can hardly be disputed. There is no cure for COVID-19 which, it is now established, can lead not only to serious illness and death, but to permanent disabilities including loss of vital senses as well as increased vulnerability to underlying conditions and new disabilities such as heart disease. (Exhibit H). "Speculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant." *Inland Steel Co. v. United States*, 306 U.S. 153, 156 (1939); *Deckert v. Independence Shares Corp.*, 311 U.S. 282, 290 (1940). In *Winter v. Natural Resources Defense Council, Inc.* 555 U.S. 7 the Court reiterated the general standard and held that a "mere possibility" of irreparable harm is insufficient to warrant a preliminary injunction. Here, the threatened injury is hardly speculative and far more than a "mere possibility." Accordingly, Plaintiffs have met this element of the test for preliminary injunction.

### The Balance of Interim Harms Tips Heavily in Plaintiffs' Favor

33.     The court must evaluate the interim harm the defendants are likely to sustain if the injunction is granted and compare it with the harm the plaintiff is likely to suffer if an injunction does not enter. *De Vico v. United States Bank*, 2012 U.S. Dist. LEXIS 155622, at *22 (C.D. Cal. Oct. 29, 2012).

34.     The real issue is the degree of harm that will be suffered by the plaintiff or the defendant if the injunction is improperly granted or denied. *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 284 (4th Cir. 2002). If a plaintiff can only show that there are serious questions going to the merits—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the balance of hardships tips sharply in the plaintiff's favor and the

*Ex Parte* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND COMPLAINT

other two *Winter* factors are satisfied. *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013)

35.     Here, in the Memorandum and Order of December 17, 2020, Defendants provide a laundry list of alleged conditions at San Lorenzo Park justifying its closure. Plaintiffs dispute these representations as a combination of exaggerated, non-existent and, in the case of the oft-repeated complaint of trash and debris—a product of the City's own negligence in having removed previously installed and serviced trash containers and sanitary facilities.

36.     But even accepting the proffered justifications as true—which Plaintiffs do not-- every one of these conditions could be remedied without forcing the homeless out -- in defiance of federal, state and county health orders and guidelines -- into a deepening deadly pandemic. The "hardships" that Defendant's might point to in opposing Plaintiffs' application are largely self-created and, in any case, pale by comparison with those faced by those evicted from the encampments with no where to go.

### The Injunction Is In The Public Interest Because, as the CDC Warns, Clearing Homeless Encampments Increases the Potential for Infectious Disease Spread

37.     The public interest analysis for the issuance of a preliminary injunction requires the Court to consider whether there exists some critical public interest that would be injured by the grant of preliminary relief. *Collins v. Brewer*, 727 F. Supp. 2d 797, 814 (D. Ariz. 2010).

38.     Here, *there is no public interest that would be injured by the grant of an injunction.* On the contrary: it is in the interests of the general public that it be protected from community spread of the coronavirus, a consequence of clearing homeless encampments expressly identified by the CDC as discussed above. In short, Plaintiffs have satisfied their burden for the issuance of a TRO and Preliminary Injunction and pray this Court will grant Plaintiff's *Ex Parte* Application.

**CLAIMS FOR RELIEF**

## FIRST CLAIM FOR RELIEF

State-Created Danger in Violation of Due Process Guarantee Under the U.S. Constitution
U.S. Const., Amend. XIV; 42 U.S.C. § 1983

Pag
- 13

39.    Plaintiffs reincorporate by reference each of the preceding paragraphs and allegations as if fully set forth herein.

40.    Under the 14th Amendment to the U.S. Constitution, no state can "deprive any person of life, liberty or property without due process of law." This federal constitutional provision confers upon Plaintiffs a right to be free from a deprivation of their due process rights by Defendants.

41.    Under 42 U.S.C. Section 1983, "[e]very person who, under color of any statute, regulation custom, or usage, of any State or Territory or the District of Columbia, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party inured in an action at law…"

42.    As part of this right, Defendants are prohibited from affirmatively placing Plaintiffs in known or obvious danger under an objective deliberate indifference standard.

43.    By clearing the homeless encampments in San Lorenzo Park and the Benchlands and failing to provide alternative safe housing, where those acts have made Plaintiffs and other similarly situated unhoused persons at greater risk of COVID-19 infection, injury and death, Defendants have affirmatively placed and continue to place Plaintiffs in known or obvious danger.

44.    Accordingly, Defendants have subjected Plaintiffs to state-created danger in violation of the 14th Amendment to the U.S. Constitution and 42 U.S.C. § 1983.

## SECOND CLAIM FOR RELIEF

State-Created Danger in Violation of Due Process Guarantees Under the California Constitution
Cal.Const. Ar. I §7

45.    Plaintiffs reincorporate by reference each of the preceding paragraphs and allegations as if fully set forth herein.

46.    Under Article I, Section 7 of the California Constitution "A persons may not be deprived of life, liberty or property without due process of law." This state constitutional provision confers upon Plaintiffs a right to be free from a deprivation of their due process rights by Defendants.

47.    As part of this right, Defendants are prohibited from affirmatively placing Plaintiffs in known or obvious danger under an objective deliberate indifference standard.

48.    By clearing the homeless encampments in San Lorenzo Park and the Benchlands and failing to provide alternative safe housing, where those acts have made Plaintiffs and other similarly situated unhoused persons at greater risk of COVID-19 infection, injury and death, Defendants have affirmatively placed and continue to place Plaintiffs in known or obvious danger.

**JURY DEMANDED**

**PRAYER FOR RELIEF**

49.    Plaintiffs reincorporate by reference each of the preceding paragraphs and allegations as if fully set forth herein:

50.    Plaintiffs respectfully request that this Court order the following:

(a) Grant a Temporary Restraining Order, Preliminary Injunction or Permanent Injunction immediately enjoining Defendants and each of them from closing San Lorenzo Park and/or the Benchlands or otherwise removing homeless persons from said locations unless and until each person/family is actually provided -- in real-time -- with safe, indoor individual housing, consistent with CDC guidelines.

(b) Order Defendants to rescind the "Memorandum and Order" of December 17, 2020 and permit homeless persons who have been displaced from San Lorenzo Park and/or the Benchlands to return to the locations.

(c) Order Defendants and each of them to strictly observe Federal (CDC), California State and Santa Cruz County Public Health Orders and guidelines regarding homeless encampments.

(d) That the Court retain jurisdiction and exercise oversight as to Defendants' compliance with its Orders.

(e) That the Court award reasonable attorney's fees to Plaintiffs' counsel

(f) Any further relief this Court deems appropriate.

Dated: December 29, 2020                              Respectfully Submitted,

                                                    __/s/ Anthony D. Prince_____

                                                    Anthony D. Prince,
                                                    General Counsel, California Homeless Union
                                                    Law Offices of Anthony D. Prince,
                                                    Attorneys for Plaintiffs

**VERIFICATION**

I, Alicia Kuhl, in my official capacity as President of the Santa Cruz Homeless Union, lead Plaintiff in the above-captioned action, declare the following:

The facts alleged in this Complaint and *Ex Parte* Application for a Temporary Restraining Order -- including the fact that individual plaintiffs Avalos, Hegel, Ingersoll and Tolley are members of the Santa Cruz Homeless Union--are true of my own knowledge, except those statements made upon information and belief and, as to such statements, I believe them to be true.

Sworn under penalty of perjury under the laws of the United States of America

Dated: December 29, 2020

At Santa Cruz, California                            /s/ Alicia Kuhl

*Ex Parte* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND COMPLAINT

# Exhibit A



State of California—Health and Human Services Agency
# California Department of Public Health



SANDRA SHEWRY, MPH,MSW
*Acting Director*
ERICA S. PAN, MD,MPH
*Acting State Health Officer*

GAVIN NEWSOM
*Governor*

## Regional Stay At Home Order
## 12/03/2020

Upon assessment of the recent, unprecedented rise in the rate of increase in COVID-19 cases, hospitalizations, and test positivity rates across California, the California Department of Public Health (CDPH) is taking immediate actions to prevent the spread of the virus.

The State, like the nation, continues to record an unprecedented surge in the level of community spread of COVID-19. California implemented an accelerated application of the Blueprint Framework metrics on November 16 and a limited Stay at Home Order issued on November 19. However, in the interim, the number of new cases per day has increased by over 112%, (from 8,743 to 18,588) and the rate of rise of new cases per day continues to increase dramatically. The number of new hospital admissions has increased from 777 on November 15, to 1,651 on December 2, and because of the lag between case identification and hospitalizations, we can only expect these numbers to increase.

Current projections show that without additional intervention to slow the spread of COVID-19, the number of available adult Intensive Care Unit (ICU) beds in the State of California will be at capacity in mid-December.  This is a sign that the rate of rise in cases, if it continues, is at risk of overwhelming the ability of California hospitals to deliver healthcare to its residents suffering from COVID-19 and from other illnesses requiring hospital care. ICU beds are a critical resource for individuals who need the most advanced support and care and the ability to add additional ICU capacity is limited by the lack of available ICU nurses and physicians as a result of the nationwide surge in hospitalizations and ICU admissions.

Because the rate of increases in new cases continues to escalate and threatens to overwhelm the state's hospital system, further aggressive action is necessary to respond to the quickly evolving situation. While vaccines are promising future interventions, they are not available to address the immediate risks to healthcare delivery in the current surge. The immediate aggressive institution of additional non-pharmaceutical public health interventions is critical to avoid further overwhelming hospitals and to prevent the need to ration care.



**NOW, THEREFORE, I, as Acting State Public Health Officer of the State of California, order:**

1. CDPH will evaluate public health based on Regions, responsive to hospital capacity for persons resident in those Regions.

2. CDPH will evaluate the adult ICU bed capacity for each Region and identify on covid19.ca.gov any Regions for which that capacity is less than 15%. When that capacity is less than 15%, the following terms (the Terms of this Order) will apply.

   a. All gatherings with members of other households are prohibited in the Region except as expressly permitted herein.

   b. All individuals living in the Region shall stay home or at their place of residence except as necessary to conduct activities associated with the operation, maintenance, or usage of critical infrastructure,[1] as required by law, or as specifically permitted in this order.

   c. Worship and political expression are permitted outdoors, consistent with existing guidance for those activities.

   d. Critical infrastructure sectors may operate and must continue to modify operations pursuant to the applicable sector guidance.

   e. Guidance related to schools remain in effect and unchanged. Accordingly, when this Order takes effect in a Region, schools that have previously reopened for in-person instruction may remain open, and schools may continue to bring students back for in-person instruction under the Elementary School Waiver Process or Cohorting Guidance.

   f. In order to reduce congestion and the resulting increase in risk of transmission of COVID-19 in critical infrastructure retailers, all retailers may operate indoors at no more than 20% capacity and must follow the guidance for retailers. All access to retail must be strictly metered to ensure compliance with the limit on capacity. The sale of food, beverages, and alcohol for in-store consumption is prohibited.

   g. To promote and protect the physical and mental well-being of people in California, outdoor recreation facilities may continue to operate. Those facilities may not sell food or drink for on-site consumption. Overnight stays at

---

[1] See https://covid19.ca.gov/essential-workforce/ for full list of California's Critical Infrastructure workforce.

campgrounds are not permitted.

h. Nothing in this Order prevents any number of persons from the same household from leaving their residence, lodging, or temporary accommodation, as long as they do not engage in any interaction with (or otherwise gather with) any number of persons from any other household, except as specifically permitted herein.

i. Terms (a) and (b) of this section do not apply to persons experiencing homelessness.

3. Except as otherwise required by law, no hotel or lodging entity in California shall accept or honor out of state reservations for non-essential travel, unless the reservation is for at least the minimum time period required for quarantine and the persons identified in the reservation will quarantine in the hotel or lodging entity until after that time period has expired.

4. This order shall take effect on December 5, 2020 at 1259pm PST.

5. For Regions where the adult ICU bed capacity falls below 15% after the effective date of this order, the Terms of this Order shall take effect 24 hours after that assessment.

6. The Terms of this Order shall remain in place for at least three weeks from the date the order takes effect in a Region and shall continue until CDPH's four-week projections of the Region's total available adult ICU bed capacity is greater than or equal to 15%. Four-week adult ICU bed capacity projections will be made approximately twice a week, unless CDPH determines that public health conditions merit an alternate projection schedule. If after three weeks from the effective date of the Terms of this Order in a Region, CDPH's four-week projections of the Region's total available adult ICU bed capacity is greater than or equal to 15%, the Terms of this Order shall no longer apply to the Region

7. After the termination of the Terms of this Order in a Region, each county within the Region will be assigned to a tier based on the Blueprint for a Safer Economy as set out in my August 28, 2020 Order, and the County is subject to the restrictions of the Blueprint appropriate to that tier.

8. I will continue to monitor the epidemiological data and will modify this Regional Stay-at-Home Order as required by the evolving public health conditions. If I determine that it is necessary to change the Terms of this Order, or otherwise modify the Regional Stay-at-Home Order, these modifications will be posted at covid19.ca.gov.

9.  When operative in a Region, the Terms of this Order supersede any conflicting terms in other CDPH orders, directives, or guidance. Specifically, for those Regions with ICU bed capacity triggering this order, the Terms of this Order shall supersede the State's Blueprint for a Safer Economy and all guidance (other than guidance for critical infrastructure sectors) during the operative period. In all Regions that are not subject to the restrictions in this order, the Blueprint for a Safer Economy and all guidance shall remain in effect.

10. This order is issued pursuant to Health and Safety Code sections 120125, 120130(c), 120135, 120140, 120145, 120175,120195 and 131080; EO N-60-20, N-25-20, and other authority provided for under the Emergency Services Act; and other applicable law.

Erica S. Pan, MD, MPH
Acting State Public Health Officer
California Department of Public Health

# Exhibit B



Public Health Division

# County of Santa Cruz

**HEALTH SERVICES AGENCY**
POST OFFICE BOX 962, 1080 Emeline Ave., SANTA CRUZ, CA 95061-0962
TELEPHONE: (831) 454-4000   FAX: (831) 454-4488   TDD: Call 711

---

### Press Release

| For Release: | Immediately | | Contact: | Jason Hoppin, County Communications Officer |
|---|---|---|---|---|
| Date: | Dec. 16, 2020 | | Phone: | (831) 454-3401 |

## REGIONAL STAY-AT-HOME ORDER IN EFFECT TOMORROW

To preserve critical ICU capacity and protect the health and safety of residents, the remaining Bay Area Region counties, including Santa Cruz County, will implement the Regional Stay-at-Home Order based on data released by the state showing ICU capacity has fallen below the threshold for implementation.

The Regional Stay-at-Home Order will commence on Thursday, December 17 at 11:59 p.m.

California's Regional Stay-at-Home Order divides the state into five regions and requires additional restrictions if a region's ICU bed availability drops below 15 percent of capacity. The restrictions require individuals to stay home unless traveling for essential purposes, prohibits leisure travel and gatherings outside one's immediate household, limits community and commercial activities, and will be in place a minimum of three weeks.

"With our case counts at an all-time high and headed higher due to the Thanksgiving surge, our hospitals and health care delivery system are at the breaking point," Santa Cruz County Health Officer Dr. Gail Newel said. "We urge all residents to adhere to state guidelines as closely as possible to minimize the spread of COVID-19 and help reduce impacts to our most vulnerable residents. Our actions now will help us return to our normal lives sooner rather than later."

The Regional Stay-at-Home Order includes a prohibition on leisure travel and but allows travel outside the home for essential purposes, including exercise. Grocery stores may remain open at 35 percent of normal capacity, and all other retail operations should limit the number of customers to 20 percent of normal capacity. All bars, wineries, breweries and distilleries must close other than for internal operations such as production and off-sale retail. Restaurants may offer delivery and take-out only, and must close outdoor dining.



**Public Health**
Prevent. Promote. Protect.
**Santa Cruz County**

Non-urgent medical and dental care, childcare and pre-K, and previously opened schools may remain open with safety precautions. Churches are restricted to outdoor services. Office work should be remote only except for critical infrastructure sectors where remote working is not possible.

Personal services such as hair salons and barbers, nail salons, esthetician services, waxing and tattoo parlors must close. Hotels and lodging establishment may take reservations for essential travel and isolation and quarantine purposes, but may not book or honor any out-of-state reservations. Campgrounds must close.

Parks including playground equipment may remain open. However, play structures at school facilities may remain open only to serve the school community.

Residents are strongly encouraged to check on friends and family and shop local in accordance with restrictions. For more on the Regional Stay-at-Home Order, go to https://covid19.ca.gov/stay-home-except-for-essential-needs. Additional guidance as follows:

- Coffee Shops – Considered restaurants and may open for take-out and delivery only.
- Youth sports – May operate outdoors only with restrictions.
- Farmers markets – May remain open with modifications.
- Gyms, group exercise and personal trainers – May offer outdoor services only with precautions.
- Libraries – Considered retail and should follow capacity limits.
- Pet grooming – Considered a limited service and must close.
- Residential and janitorial cleaning services – May remain open.
- Funeral Homes – Considered critical infrastructure and can remain open.
- Massage therapy – Must close unless client has a valid prescription.
- Real estate – May offer in-person showings to individual prospective buyers only. Open houses not allowed.

For help accessing mental health services, click on this link: **https://tinyurl.com/y2lvohxp**

###

# Exhibit C

SANTA CRUZ

## Memorandum and Order

To:        Santa Cruz City Council; Santa Cruz Parks & Recreation Commission

From:      Tony Elliot, Director of Parks & Recreation; Martin Bernal, City Manager

CC:        Tony Condotti, City Attorney; Andrew Mills, Police Chief

Date:      December 17, 2020

Re:        San Lorenzo Park – Temporary Closure
           Parks Director Park Closure Order / City Manager Emergency Executive Order No. 2020-24

Dear Councilmembers and Parks & Recreation Commissioners,

Pursuant to authority within the Santa Cruz Municipal Code[1], we hereby authorize and order the temporary closure of the San Lorenzo Park and the Benchlands. The temporary closure will be accomplished in phases, with the goal of temporarily closing the entire park by January 6, 2021. We will aim to keep the lawn bowling green, playground, and Riverwalk path open during the closure period.

City staff may cause fencing to be erected to effectuate the closure, and signage will be posted indicating the closure.

The closure period will end on January 31, 2021, unless an extension of the closure is authorized. Per City Council Policy 7.1, the purpose of this memorandum is to inform the City Council and Parks & Recreation Commission of this action.

As I am sure you are aware, San Lorenzo Park and the Benchlands have been an encampment location since April of 2020. When unsheltered individuals first started to inhabit this area, the City attempted to implement a "socially distant" encampment layout, and the City provided trash services and hygiene resources to encampment occupants. Eventually, nuisance conditions became overwhelming, and the City and the County partnered together to establish a managed camp at the Benchlands. During the managed camp's operation, there was still a significant presence of "unmanaged" encampments at this location, and the City continued to provide trash service and hygiene resources to those living in "unmanaged" encampments.

In September of 2020, the County determined that the Benchlands managed camp needed to be relocated for the Fall/Winter, given that the Benchlands is in a low-lying floodplain. On November 15, 2020, the County transitioned its managed camp program to The Armory, but unmanaged encampments remained, have grown in size and quantity, and have become more entrenched.

---

[1] This action is authorized under various provisions of the Santa Cruz Municipal Code (SCMC), including SCMC sections 13.04.011 and 13.04.102 (authorizing the Parks Director to set parks hours and withdraw park areas from public use); sections 4.16.030 and 4.01.010(16) (authorizing abatement of public nuisances and life safety hazards); and sections 2.20.080 and 2.20.040 (authorizing the City manager to abate nuisances related to certain declared emergencies and also "[m]ake and issue rules and regulations on matters reasonably related to the protection of life and property as affected by such emergency.")

In recent weeks, the conditions at San Lorenzo Park have deteriorated to the extent that we feel that a temporary park closure is the City's best and only realistic option.  Specifically:

- The City's facilities have been vandalized with graffiti and illegal electrical taps.
- This site has been host to fires and fire safety issues.
- The City has received increased calls for service related to reported criminal activity in the area, including calls related to trespassing on nearby private property and even defecating within a neighboring garage.
- City staff has also observed a lack of social-distancing and mask wearing, and thus, it is possible that an encampment of this size and density could become a COVID-19 hotspot.
- The presence of criminal activity in the area prevents the City's park from being used as a park by the community.
- City staff is aware of theft of City tools and supplies.
- Encampments have destroyed the City's grass.
- Encampments are attached to trees, likely damaging those trees.
- Branches from the City's trees have been incorporated into encampment structures.
- Significant City resources are currently being used to manage the voluminous trash and needles that are created by occupants of the unmanaged encampments.
- This site has experienced large amounts of improperly disposed litter, in addition to human and animal waste.
- City staff no longer feel safe in the area and must operate in pairs.
- The City needs to conduct deferred maintenance in the park.

It is worth noting that the City recently paid over $140,000 to clean and start the rehabilitation process of areas within the Pogonip.  Especially during this time of significant budgetary constraints, we have a duty to preserve the park grounds and facilities and to prevent exorbitant rehabilitation expenses from becoming necessary at San Lorenzo Park.

Individuals who currently reside in encampments in the park will be given reasonable written notice of this closure.  We hope to work with the County to make sure that, to the greatest extent possible, outreach workers contact impacted individuals and try to connect them with any available shelter resources.

Please feel free to call or write with any questions you may have about this matter.

Thank you,

Tony Elliot, MPA, CPRP
Parks & Recreation Director
(831) 421-1872
telliot@cityofsantacruz.com

Martin Bernal
City Manager
(831) 420-5010
mbernal@cityofsantacruz.com

# Exhibit D

**Alicia Kuhl** <alicia1l@hotmail.com>
To:princelawoffices@yahoo.com
Mon, Dec 28 at 3:16 PM

---

Hide original message
**From:** Alicia Kuhl <alicia1l@hotmail.com>
**Sent:** Sunday, December 20, 2020 2:15 PM
**To:** princelawoffices@yahoo.com <princelawoffices@yahoo.com>
**Subject:** Fw: URGENT: Need your help in writing the Sentinel

Here it is

---

**From:** Keith McHenry <calichearttaos@gmail.com>
**Sent:** Sunday, December 20, 2020 11:32 AM
**To:** Alicia Kuhl <Alicia1L@hotmail.com>
**Subject:** Fwd: URGENT: Need your help in writing the Sentinel


Sent from my iPhone

Begin forwarded message:

**From:** Laura Chatham <laurachatahm@gmail.com>
**Date:** December 20, 2020 at 10:18:56 AM PST
**To:** Laura Chatham <laurachatahm@gmail.com>
**Subject: Fwd: URGENT: Need your help in writing the Sentinel**


The City Manager, Martin Bernal, via an Executive Order, is evicting people starting this Monday, at San Lorenzo Park. The City is doing this during Christmas holidays. Not only is this cruel but very well planned out while many City and County staff are on vacation.

Almost all individuals at San Lorenzo park are staying inside their tents sheltering in place. The City is going to take away the 3 porta potties, the washing stations and have ordered the portable shower truck to stop their service. Not only does the encampment sweep go against the CDC Guidelines, but taking away all the hygiene facilities is exactly the opposite of what the CDC suggests to do. And our own County Health Director, Dr. Gail Newel is against the encampment sweep (See below). Martin Bernal has not asked for the advice of our County Health Director even though he states the reasons for the sweeps are due to health concerns regarding COVID.
CDC Guildelines: https://www.cdc.gov/coronavirus/2019-ncov/community/homeless-shelters/unsheltered-homelessness.html#facility-encampments

Can you help in writing the Reporter, Hannah Hagemann, Martin Bernal and the City Council asking them to not evict the people staying at San Lorenzo Park and instead supply more porta potties and wash stations?

EMAILS:
**HANNAH HAGEMANN** | hhagemann@santacruzsentinel.com |
Martin Bernal <mbernal@cityofsantacruz.com>
citycouncil@cityofsantacruz.com

I spoke to many Outreach workers and county staff who work with houseless individuals and they are livid and advise against this sweep. As stated in the CDC Guidelines, **dispersing encampments breaks connections with service providers.**

Not just sweeping the encampment is against the CDC Guidelines, but **taking away porta potties, washing stations and showers** is doing the exact opposite.

Months ago, the City has already taken away their trash pickups but the residents there have been keeping it clean. Instead, the City stakes out cops there all day long waiting for an argument so they can claim there are nuisance violations.

I urge you to take a walk there and see how clean the residents are keeping this camp. It is the cleanest encampment I have ever seen in Santa Cruz.    **Please write asking the Sentinel, the City Council and Martin Bernal asking them to not disperse the encampment at San Lorenzo.**

**Gail Newel**
Health Officer at County of Santa Cruz

· · ·



**Gail Newel** · 1st
Health Officer at County of Santa Cruz

──────── TODAY ────────



**Abbi Dale** · 7:34 AM

Hello Gail, can you please let me know why the City is evicting
people at the encampment at San Lorenzo against CDC guidelines?
The camp is the cleanest encampment I have seen in Santa Cruz.
The CDC says dispersing encampments leads to more spreading of
COVID.
The shelters are all FULL!
Thank you



**Gail Newel** · 7:36 AM

Hi Abbi, I agree with you and share your concerns. This was a
decision of the City of Santa Cruz, independent of the County, for
which I work. Public Health was not consulted about this. If we had
been, we would have advised against this for the very reasons you
cite. Thank you for being an involved community member.

# Exhibit E

**Alicia Kuhl** <alicia1l@hotmail.com>

To:princelawoffices@yahoo.com
Mon, Dec 28 at 7:25 PM
Here is my cease and desist letter

Hide original message
**From:** Alicia Kuhl
**Sent:** Friday, December 18, 2020 10:08 AM
**To:** Martin Bernal <mbernal@cityofsantacruz.com>; Telliot@cityofsantacruz.com
<Telliot@cityofsantacruz.com>
**Cc:** Keith McHenry <keith@foodnotbombs.net>; princelawoffices@yahoo.com
<princelawoffices@yahoo.com>; Robert Norse <rnorse3@hotmail.com>; Reggie Meisler
<reggie.meisler@gmail.com>; gailpage@earthlink.net <gailpage@earthlink.net>; Gail Newel
<Gail.Newel@santacruzcounty.us>; Tristia of NLCHP <tbauman@nlchp.org>; Bill Freeman
<wfreeman@aclunc.org>; ckrohn <ckrohn@cruzio.com>; Crystal Sanchez
<sacramento.homeless.union@gmail.com>; Candace Brown <clbrown23@gmail.com>; City (!!!) Council
<citycouncil@cityofsantacruz.com>; tcondotti@abc-law.com <tcondotti@abc-law.com>
**Subject:** Executive order of 12/17/20 Cease and Desist

https://kion546.b-cdn.net/2020/12/Santa-Cruz-encampment-executive-order-12-17-20.pdf

In Regards to your executive order to close San Lorenzo park (even temporarily)

# Considerations for encampments

- If individual housing options are not available, allow people who are living
  unsheltered or in encampments to remain where they are.
    - Clearing encampments can cause people to disperse throughout the
      community and break connections with service providers. This
      increases the potential for infectious disease spread.
- Encourage those staying in encampments to set up their tents/sleeping
  quarters with at least 12 feet x 12 feet of space per individual.
    - If an encampment is not able to provide sufficient space for each
      person, allow people to remain where they are but help decompress
      the encampment by linking those at increased risk for severe
      illness to individual rooms or safe shelter.
- Work together with community coalition members to improve sanitation in
  encampments.
- Ensure nearby restroom facilities have functional water taps, are stocked
  with hand hygiene materials (soap, drying materials) and bath tissue, and
  remain open to people experiencing homelessness 24 hours per day.

- If toilets or handwashing facilities are not available nearby, assist with providing access to portable latrines with handwashing facilities for encampments of more than 10 people. These facilities should be equipped with hand sanitizer (containing at least 60% alcohol).

https://www.cdc.gov/coronavirus/2019-ncov/community/homeless-shelters/unsheltered-homelessness.html

Your executive order to close the park based on clearing the current "unmanaged" encampment is against the CDC guidelines. Furthermore your list of justifications to do such order is also questionable according to the guidelines. You state that amongst other things that the city could easily rectify that there is a large amount of "Improperly disposed of Litter" If the city had been following the CDC guidelines at all, this amount of litter would not have accumulated because the city would have been bringing in the necessary services to this encampment thus the litter wouldn't exist.

I Hereby request that you CEASE AND DESIST from the closure of San Lorenzo park and the displacement of the encampment that resides there until at such time as individual alternative placement options are available for every homeless individual residing at San Lorenzo Park. Or you may be faced with legal action for violating the CDC guidelines and placing the homeless community in further harm, and the community of Santa Cruz in danger due to your repeated violations of the Covid-19 guidelines given by the Center For Disease Control. Please follow the guidelines of the CDC immediately.

Alicia Kuhl
President of the Santa Cruz Chapter of the California Homeless Union
(831) 431-7766


Alicia Kuhl

She/Her/Hers

Shift Supervisor

**Emergency Interim Housing (EIH) Rue Ferrari**

HomeFirst Services of Santa Clara County

(Mobile) (831) 431-7766

# Exhibit F



**CENTERS FOR DISEASE
CONTROL AND PREVENTION**

# Interim Guidance on Unsheltered Homelessness and Coronavirus Disease 2019 (COVID-19) for Homeless Service Providers and Local Officials

Interim Guidance

Updated Aug. 6, 2020

## Considerations for people experiencing unsheltered homelessness

## Considerations for encampments

- If individual housing options are not available, allow people who are living unsheltered or in encampments to remain where they are.
  - Clearing encampments can cause people to disperse throughout the community and break connections with service providers. This increases the potential for infectious disease spread.
- Encourage those staying in encampments to set up their tents/sleeping quarters with at least 12 feet x 12 feet of space per individual.
  - If an encampment is not able to provide sufficient space for each person, allow people to remain where they are but help decompress the encampment by linking those at increased risk for severe illness to individual rooms or safe shelter.

- Work together with community coalition members to improve sanitation in encampments.
- Ensure nearby restroom facilities have functional water taps, are stocked with hand hygiene materials (soap, drying materials) and bath tissue, and remain open to people experiencing homelessness 24 hours per day.
- If toilets or handwashing facilities are not available nearby, assist with providing access to portable latrines with handwashing facilities for encampments of more than 10 people. These facilities should be equipped with hand sanitizer (containing at least 60% alcohol).

## COVID-19 Readiness Resources

- Considerations for food pantries and food distribution sites
- Visit cdc.gov/COVID19 for the latest information and resources
- Information for health departments
- Guidance for homeless service providers
- COVID-19 fact sheets for people experiencing homelessness (at the bottom of the page)
- Department of Housing and Urban Development (HUD) COVID-19 resourcesexternal icon
- CDC's COVID-19 stress and coping information

# Exhibit G



# Protesters form wall to protect homeless encampment at San Lorenzo Park; police stand down

BY ISABELLA CUETO
Source:  Lookout Santa Cruz
DEC 28, 2020 | 1:35 PM
Updated On DEC 28, 2020 At 3:23 PM
- Facebook
- Twitter
- Show more sharing options

Protesters on Monday formed a human wall and ultimately prevented Santa Cruz police from dispersing residents from parts of a homeless encampment at San Lorenzo Park.

The action stopped the second phase of a three-phase plan to shut down the park amid complaints that the encampment had grown unsafe. Rather than clash with protesters and encampment residents, Santa Cruz Police Chief Andy Mills said his department chose to deescalate the situation and delay action.



Break up San Lorenzo homeless encampment? 'We would have advised against this,' county health officer writes



Police and protesters meet up at San Lorenzo Park on Monday morning. (Kevin Painchaud/Lookout Santa Cruz)

The department's actions came after city manager Martín Bernal handed down an emergency order on Dec. 17 to close the park.

For at least a month, San Lorenzo Park has been home to a large number of people who chose to stay put in downtown Santa Cruz after the Federal Emergency Management Agency ordered Santa Cruz County to move its homeless encampment out of the nearby Benchlands floodplain. The county relocated that camp to the Armory

in DeLaveaga Park, and it is now completely full — as are all other shelter beds countywide, according to county officials.

A coalition of roughly 50 people, calling themselves Stop The Sweeps, formed a barrier ahead of the officers' arrival at 8:30 a.m., with some shouting at the police through megaphones.



Protestors form a human chain in an attempt to block police from entering San Lorenzo Park on Monday morning.
(Kevin Painchaud/Lookout Santa Cruz)

Officers eventually dismantled a chain-link fence the protesters had barricaded themselves behind and moved past the loud, chanting human wall and into San

Lorenzo Park. The protesters continued to surround the police as they walked around the park's encampments.

Rather than engage the crowd, the officers eventually left the park without incident.



Santa Cruz County homeless deaths hit all-time high in 2020

By mid-morning, four police officers remained, standing on a sidewalk across the street from the encampment. Inside San Lorenzo Park, protesters and residents mulled about, drinking cups of coffee and bowls of chicken noodle soup provided to them by volunteers.

Protest organizers told Lookout they thought that law enforcement would return in "full force" later Monday and possibly make arrests, but Mills said that was not true. He said the police are pushing back the sweep to another day.

"We choose to deescalate things rather than escalate," Mills said, adding that police gave 72-hour notices to people living at the park and explained the three phases of the sweep to them.



Police and protesters meet up at San Lorenzo Park on Monday morning.
(Kevin Painchaud/Lookout Santa Cruz)

"Today is not a final deadline," he said.

The first phase occurred last week, when a grassy patch on one side of San Lorenzo Park's duck pond was cleared out. The second sweep was set to occur Monday morning, though it was unclear what section of the park was to be emptied.

Mills declined to specify when his officers would return to carry out the second phase. He said residents of the park could be arrested for violating the city's executive order, but that his department often issues citations during sweeps instead of taking people into police custody.

The city's order cited overcrowding, fire safety issues, trash build-up, reported criminal activity and damage to the grass and trees as reasons for closing the park.



Protestors form a human chain in an attempt to block police from entering San Lorenzo Park on Monday morning.
(Kevin Painchaud/Lookout Santa Cruz)

But homeless advocates and community activists say the city's reasoning is flawed and disregards the possible negative health impacts of moving hundreds of people out of the park, away from centralized services and potentially into other pockets around Santa Cruz.

County Health Officer Gail Newel and her staff weren't consulted about the city's decision, and "if we had been, we would have advised against this," Newel wrote in an electronic message that was the subject of a recent Lookout report.



Police spent the morning breaking down chain-link fence.
(Kevin Painchaud/Lookout Santa Cruz)

Contributor: Kevin Painchaud

Isabella Cueto is a Government Accountability Correspondent for Lookout Santa Cruz. She will take a deep look at the inner workings of the cities of Santa Cruz, Capitola, Watsonville and Scotts Valley, with the goal of holding local leaders accountable. She can be reached at isa@lookoutlocal.com or 954-406-8016.

# Exhibit H

# Most Recovered COVID-19 Patients Left With Heart Damage, Study Shows

BY **KATHERINE FUNG** ON 7/29/20 AT 5:23 PM EDT

Advertisement 0:59

**SHARE**

**NEWS**CORONAVIRUSHEART DISEASEHEART ATTACKCARDIOVASCULAR HEALTH

A new study published Monday in the JAMA Cardiology Journal found that 78 percent of recovered COVID-19 patients had permanent heart damage.

The study from the University Hospital Frankfurt examined the cardiovascular MRIs of 100 people who had recovered from the coronavirus. The heart images showed that almost 80 percent of recovered COVID-19 patients had structural changes to their hearts.

Sixty percent of patients had ongoing myocardial (heart muscle) inflammation even after recovery.

The majority of the patients were not hospitalized and recovered at home, with symptoms ranging from none to moderate.

**NEWSWEEK SUBSCRIPTION OFFERS >**

Dr. Valentina Puntmann, who led the study, told STAT that even though coronavirus is not strongly associated with heart symptoms, the muscle is showing to play a major role in battling the virus.

"The fact that 78 percent of 'recovered' [patients] had evidence of ongoing heart involvement means that the heart is involved in a majority of patients, even if COVID-19 illness does not scream out with the classical heart symptoms, such as anginal chest pain," she said. "In my view, the relatively clear onset of COVID-19 illness provides an opportunity to take proactive action and to look for heart involvement early."

An earlier study from March found cardiac injury in 19 percent of hospitalized patients in Wuhan, China, where the first case was diagnosed.

While the long-term effects of the virus remain unknown, these studies suggest that there are detrimental effects to cardiovascular systems to those infected, even after recovery.

**NEWSWEEK SUBSCRIPTION OFFERS >**

Those with pre-existing health conditions are also known to be a vulnerable population in the ongoing health crisis. Individuals who suffer from high blood pressure, coronary artery disease or heart failure have notably been at higher risk of infection and death.

As more becomes known about the coronavirus, there have been reports of lingering symptoms or prolonged infections. In one case, a Texas teen has reportedly had COVID-19 for 54 days, testing positive three times as her symptoms persisted. Most patients are expected to recover within two weeks, according to the World Health Organization.



A recovered coronavirus patient is monitored at the Department of Rehabilitative Cardiology of ASL 3 Genova on July 23, in Genoa, Italy.

A new study found that more than three-quarters of recovered COVID-19 patients had suffered heart damage.MARCO DI LAURO/STRINGER

Other early studies have indicated other possible long-term effects of the virus may include blood clotting, strokes, lung damage and neurological symptoms, such as loss of smell or taste.

The most immediate impacts of COVID-19 have been on the respiratory system. Those with severe cases of coronavirus have faced life-threatening pneumonia. About 20 percent of infected patients required hospitalization to treat pneumonia, according to a study in the European Respiratory Journal.
Columbia professor of epidemiology Stephen Morse told Newsweek that some of these long-term impacts may not be surprising but it is extremely difficult to predict when correlation is strong enough to become cause-and-effect.

"We're still wondering what's going to happen to all those children who have circulatory diseases and get better. Will they have some long-term effect?" Morse said. "In those situations, we're paying much closer attention than we usually do because we have some experience with coronavirus."

As of Wednesday, July 29, more than 16 million confirmed cases have been reported worldwide, according to data from a Johns Hopkins

University tracker. Of those infected, 9,807,900 have recovered from COVID-19 globally.

As positive cases began to rise again in Spain, Belgium and the Netherlands, Europe fears a second wave of coronavirus cases. Several countries in Asia have also seen a resurgence of infections. On Wednesday, China reported its highest number of new daily cases since April.

Across the U.S., which is still in its first wave of the virus, a number of states have emerged as global hot spots after dramatic spikes in cases forced officials to rollback reopening. The U.S. has reported more confirmed cases of COVID-19 than any other country.

READ MORE